## THE ENRIQUE.

*(District Court, D. Maryland. May 12, 1881.)*

1. CONTRACT OF AFFREIGHTMENT.

A bill of lading for live beef cattle shipped by agreement on the deck of a steamer for a voyage from Baltimore to Liverpool, in December, 1880, contained, in addition to usual exceptions, a clause exempting ship-owners from any loss that might arise through cattle being jettisoned.

*Held,* to mean that the ship-owner was not to be liable for contribution if the cattle should be thrown overboard for the safety of the ship.

*Held,* that with regard to a deck load of live cattle this limitation of the ship-owner's liability was not unreasonable or against public policy.

*Held,* if the cattle were thrown overboard because, during a prolonged storm, and without any fault of the ship-owner, they had got loose and were imperilling the ship, that under the limitation in the bill of lading the ship is exempted from contribution.

In Admiralty.

*O. F. Bump* and *I. S. Rosenthal,* for libellant, cited the following cases:

The agreement is a charter-party. Dixon on Shipping, 198; 1 Parsons on Shipping, 284; 1 Parsons on Maritime Law, 229; 3 Kent's Com. 201; *The Tribune,* 3 Sumn. 144; *Drinkwater* v. *The Spartan,* 1 Ware, 149. A charter-party is not affected by a bill of lading. Dixon on Shipping, 202; 1 Parsons on Shipping, 286; 1 Parsons on Maritime Law, 240; *Perkins* v. *Hill,* 2 Woodbury & Minot, 158; *Lamb* v. *Parkman,* 1 Sprague, 343; *The Eliza's Cargo,* 1 Low. 83; *The Ethel,* 5 Ben. 154; *Capper* v. *Wallace,* L. R. 5 Q. B. Div. 163; *Caughey* v. *Gordon,* L. R. 3 C. P. Div. 419; *Gledstanes* v. *Allen,* 12 C. B. 202; *Kern* v. *Deslandes,* 10 C. B. (N. S.) 205; *Willett* v. *Phillips,* 8 Ben. 459; *Sandeman* v. *Scurr,* L. R. 2 Q. B. 86; *The Patria,* L. R. 3 A. & C. 436. A contract limiting the liability of a carrier must be strictly construed. *New Jersey Steam Nav. Co.* v. *Mer. Bank,* 6 How. 344. Contribution is founded on natural justice, and not on contract. *Sturges* v. *Cary,* 2 Curt. 383. An exception to the liability of a carrier as such does not relieve him from contribution. *Crooks* v. *Allen,* L. R. 5 Q. B. Div. 38; *Schmidt* v. *Steam-ship Co.* 45 L. I. Q. B. Div. 646. An attempt to exempt from liability to contribution is void as against public policy. *Railroad Co.* v. *Lockwood,* 17 Wall. 357; *Railroad Co.* v. *Platt,* 22 Wall. 123; *Bank* v. *Adams Exp. Co.* 93 U. S. 174. An agent to load has no power to alter the terms of a charter-party. *Lickens* v. *Irving,* 7 C. B. (N. S.) 165; *Rich* v. *Parrott,* 1 Sprague, 358; *A Cargo of Salt,* 4 Blatchf. 225. A deck-load cargo is entitled to contribution. 2 Parsons, Marine Ins.

220; *Gould* v. *Oliver*, 4 Bing. (N. C.) 134; S. C. 2 Man. & G. 208; *Hurley* v. *Milward*, 1 Jones & Carey, 224; *Milward* v. *Hibbert*, 3 Q. B. 120; *Johnson* v. *Chapman*, 19 C. B. (N. S.) 563; *Brown* v. *Cornwell*, 2 Root, 60; *Harris* v. *Moody*, 30 N. Y. 226; S. C. 4 Bosw. 210; *Gillett* v. *Ellis*, 11 Ill. 579; *Mer. & Man. Ins. Co.* v. *Shillito*, 15 Ohio St. 559; *Toledo Ins. Co.* v. *Speares*, 16 Ind. 52; *Meaher* v. *Lufkin*, 21 Tex. 383; *The Watchful*, 1 Brown, Ad. 469; *The Wm. Gillum*, 2 Low. 154; *Wood* v. *Phœnix Ins. Co.* 1 FED. REP. 235; *Schr. May & Eva*, 6 FED. REP. 628. The value in case of jettison is the value at time of jettison, estimated at cost price, without regard to possibility of being saved. *Johnson* v. *Chapman*, 19 C. B. (N. S.) 563; *Barnard* v. *Adams*, 10 How. 270; *Rogers* v. *Mechanics' Ins. Co.* 2 Story, 173; *Rogers* v. *Mechanics' Ins. Co.* 1 Story, 603; *Lee* v. *Grinnell*, 5 Duer, 400; *Davis* v. *Garrett*, 6 Bing. 724. Declarations which are a part of the *res gestæ* are admissible. 1 Wharton on Ev. § 259; *Flint* v. *Transportation Co.* 7 Blatchf. 536, 13 Wall. 3; *Insurance Co.* v. *Mordey*, 8 Wall. 397; *Castner* v. *Slicker*, 33 N. J. 95; *State* v. *Wiener*, 17 Kan. 298.

*T. W. Hall*, for respondents, cited:

Machlachlan's Merchants' Shipping, 498–618; 3 Kent, 216; *The Delaware*, 14 Wall. 596; *The Niagara*, 21 How. 23; *Lawrence* v. *Minturn*, 17 How. 111; *Smith* v. *Wright*, 1 Caines, 43; *Cram* v. *Aiken*, 13 Me. 229; *Sproul* v. *Donnell*, 26 Me. 185; *Dodge* v. *Bartoll*, 5 Greenl. 286; *Doane* v. *Keating*, 12 Leigh, 391; *Schelford* v. *Wilcox*, 9 La. 33; *Milwaukee Belle*, 2 Bissel, 197; Parsons, Mar. Law, 316.

MORRIS, D. J. The libellant seeks to recover the value of 126 head of beef cattle shipped by him on board the Spanish steamer Enrique, 2,300 tons, at Baltimore, to be carried to Liverpool, and which were cast overboard on the voyage. By a contract dated December 2, 1880, the agent of the steamer agreed with the libellant, a large cattle dealer of Chicago, to let to him the deck freight room of the steamer for about 100 cattle on deck, the freight to be 60 shillings per head, payable in cash before sailing, and whether delivered or not delivered at Liverpool. The contract provided that the space for each beast should be not less than eight feet by two feet six inches, and that the stalls should be constructed at the ship's expense, to the satisfaction of the shipper and of the underwriters' inspector. It further provided with particularity for furnishing by the ship of water for the cattle, gangways for loading and unloading, space under deck for forage, free passage out and back for drovers, for six days' notice to shipper of steamer's readiness to receive the animals, and of the exact number the ship would take, and that the steamer

should pay any additional cost of keeping the animals if the steamer did not sail at the expiration of the notice.

One hundred and twenty-six head of cattle, many of them weighing over 1,700 pounds, were duly put on board, under the superintendence of an agent of the libellant, on the eighteenth of December, 1880, filling up all the available deck room of the steamer, both forward and aft. The freight was paid in advance, and thereupon four bills of lading, all of the same tenor and effect, were delivered to and indorsed "accepted" by the libellant's agent. These bills of lading, among other things, stipulated that the cattle were to be carried on the upper deck, and that the steam-ship owners should not be responsible for any loss that might arise through the cattle being washed overboard or *jettisoned*. They also stated that the acceptance thereof was a recognition of the bill of lading as the contract binding both carrier and shipper. They contained in substance the same stipulation as to the contract for the care and feeding and watering of the cattle, and the usual exceptions against fire and the perils of the sea, and for liberty to tow and assist vessels, etc. The steamer sailed with a general cargo, principally cotton, grain, and provisions, and about 10 hours after leaving the capes of the Chesapeake encountered very rough and tempestuous weather, which lasted from the night of the 20th until some time in the night of the 24th, and in the gale that prevailed during that time the steamer shipped heavy seas, which broke down many of the stalls, carried away a portion of the rail, and did some other damage to the ship. In consequence of the violence of the storm some of the cattle were washed overboard. Some were drowned on deck, and some were badly crippled and injured. Almost from the commencement of the storm it was impossible to feed or water the cattle, and the rolling of the ship prevented those which were not injured from standing. On the 21st five were found dead, and thrown overboard. On the 22d, the storm not abating, the ship was hove to, and all the cattle aft of the foremast were cast over; and on the 24th, the storm still continuing, some 20 or 30 beasts remaining in the forward part of the deck, and which

had been in some measure protected by the forecastle deck, were cast over. When the storm abated, on the night of the 24th, none of the cattle were left on board.

The libellant claims that the cattle were thrown overboard, not because they were dead or dying, and therefore unfit for further transportation, as is alleged by the respondent, but because it was necessary to jettison them to save the vessel and the rest of her cargo from impending danger. The libellant further claims that the acceptance of the bill of lading by his agent, who was appointed simply to attend to putting the cattle on board, was without authority and not binding upon him, and that the live-freight contract, and not the bill of lading, is to determine his rights; and further, that in any event the exception in the bill of lading for loss from the cattle being jettisoned is void as against public policy.

Counsel for libellant have strenuously contended that the paper called a "live-stock freight contract" is to be treated as a charter-party for the use of the deck of the steamer, and that being a charter-party the rights of the parties to it are not to be affected by the terms of the bill of lading. To this I cannot agree. The cattle were to be brought from Chicago to Baltimore for shipment, and as keeping them there would be attended with expense, the shipper required to know before they left Chicago that the steamer would be ready to take them, the number she would take, the amount of freight, and the arrangements for their care and subsistence. These matters are very carefully set out in the contract, but it contains none of the exceptions for the protection of the ship-owner usually to be found in charter-parties and bills of lading; and I cannot think it was intended to supersede the usual bill of lading. If it did, the ship-owner would, in effect, have become insurers of the safe delivery of the cattle, a result never contemplated by either party. The stipulations of the bill of lading do not contradict the contract, but are supplementary to it. It is shown that the libellant had made several shipments of cattle from Baltimore to Liverpool by steamers of this same line after making similar contracts with the same agents, and that in every instance precisely

similar bills of lading, in sets of four, were given and accepted. The libellant's agent testified that of these four he had always sent one to the libellant at Chicago, one to the agent of the underwriters of the cattle, one to the consignees at Liverpool, and had given the other to the foreman of the drovers on board.

The case does not, as it seems to me, come within the principle of any of the cases cited, in which it has been held that, as between ship-owner and charterer, the charter-party should override the bill of lading in case of conflict between them. If, then, the bill of lading is to be treated as the evidence of the final contract between the parties in those particulars in which it is not found to contradict the previous contract, we are to consider whether its effect is to release the ship-owner from contribution for the cattle if thrown overboard to save the ship; and, if that is its meaning, is it such a limitation of the carrier's liability as the court should uphold? It is true that the defence made by the answer rests mainly upon the allegations that the cattle were cast overboard, not because they endangered the ship, but because they were either already dead or so nearly so as to be beyond hope of recovery. But this issue presents a question of fact naturally difficult to determine from the evidence. Unquestionably numbers of the cattle are shown to have been dead, or dying, when thrown over. All were greatly exhausted from want of food and drink, from the violence of the blows they received from the broken timbers of the pens and from each other, and from being thrown about by the pitching and rolling of the vessel, and from being drenched with salt water. Whether any, and if so, how many, it would have been possible, when the storm abated, to have resuscitated and delivered in Liverpool in merchantable condition, it would be difficult to determine. The five drovers employed by libellant, who were on board in charge of the cattle, contradict the officers of the steam-ship, and now undertake to say that a majority of the cattle, or at all events the 20 or 30 which were near the forecastle hood, could have been saved; but it is evident they are speaking now with much more confidence

than they did when first questioned on this subject. In the midst of a storm of such duration, with the pens broken down, the cattle loose and lying prostrate, and the seas washing over the deck, it is hardly to be supposed that a very critical examination of the beasts was made.

There is no suggestion that they were thrown overboard wantonly, and the effort of the libellant has been to show, from statements alleged to have been made to the drovers by the engineer, speaking for the captain, (who could speak hardly any English,) that he considered it essential to the safety of the ship that the cattle should go, giving as the reason that, the pens having got loose, the whole deck load was liable to shift to one side with the violent rolling of the ship, and also because the cattle, having got out of the pens, were likely to become entangled with the rudder chains on the deck. If the statements of these witnesses for the libellant are taken for truth, they make a case in which the cattle were cast over to save the vessel, and indeed the whole evidence shows a condition of peril in which jettison of such a deck load was justifiable. In the argument by counsel the question of the liability of the ship-owners for contribution for jettison was fully argued, and I am inclined to think it is the principal issue in the case.

The language of the bill of lading is: "Steam-ship owners are not responsible for any loss that may arise through cattle being jettisoned." This exemption, if the definition of the word "jettisoned" were substituted for the word itself, would read: "Ship-owners are not responsible for any loss that may arise through cattle being voluntarily thrown overboard in case of extreme peril, in order to lighten the ship and preserve her."

In *Crooks* v. *Allen*, L. R. 2 Q. B. Div. 38, and *Schmidt* v. *Steam-ship Co.* 45 L. I. Q. B. Div. 646, a bill of lading for goods to be carried through to their destination by steam-ship and railroad contained an exception from loss by "fire on board." This was held to have reference to the obligation of the ship-owner as carrier only, and to his contract as carrier to deliver the goods, and as not intended to take away the

ordinary liability to contribute in general average as owner of the ship when a fire had occurred on board and the goods had been injured, not by the fire, but by water thrown down into the hold to extinguish it.

Such a construction cannot, it seems to me, be put upon the bill of lading in this' case; for, unless the exemption for cattle jettisoned have reference to *contribution,* it can have no meaning at all, as, under the ordinary exception of perils of the sea in case of jettison, the ship could only be held for contribution.

It remains, then, to consider whether this restriction of the ship-owner's liability is so unreasonable, unusual, and inconsistent with sound public policy, that, looking to the situation of the parties, the court should refuse to uphold it. It is to be borne in mind that this limitation of responsibility in reference to a deck load is an exception to an exception, and that by it the general rule is made to prevail; the general rule being that goods carried on deck, though thrown over for the common benefit, give no claim for contribution. To this acknowledged and ancient rule exceptions have been recognized in more modern times, in cases where, by settled usage of trade or by the agreement of the parties, it is shown that the goods were properly to be carried on deck.

The transporting of live cattle across the Atlantic is shown to be a new undertaking. The present libellant states that he thinks he was, perhaps, among the first to attempt it, which was only three years ago. The earlier shipments were made in the summer months, and proved encouraging, but shipments in the winter months, as in this instance, are still to be considered, I think, rather an experiment than an established business. The risks are known to be exceptionally great. A high rate of freight is exacted in advance, determined by the number of cattle put on board and not by the number delivered, the underwriters demand a high rate of premium, and everything connected with the venture is matter of special agreement rather than of settled usage. Under these circumstances, why should not the parties be left to make their own bargains with regard to the transportation

across the sea. They deal on terms of equality, and neither needs protection from the other. In this case, moreover, the libellant had on several previous occasions accepted similar bills of lading, and only by great inattention could he, or those to whom he entrusted his business, have failed to notice the limitation clause now resisted. It does not appear, therefore, that the limitation was an unexpected, unusual, or novel one. On the contrary, it is such an one as, it seems to me, the shipper might reasonably have expected the bill of lading to contain; and, however hardly it may result against the shipper, I cannot see that with regard to a deck load, and looking to the general rules of maritime law with regard to deck lading, it can be said to be against public policy.

Being of opinion, therefore, that by the exception in the bill of lading the ship-owner is exempted from contribution for the cattle jettisoned, I dismiss the libel.